## LEATHERS v. BLESSING.

1. The term "torts," when used in reference to admiralty jurisdiction, embraces not only wrongs committed by direct force, but such as are suffered in consequence of negligence or malfeasance, where the remedy at common law is by an action on the case.
2. The jurisdiction in admiralty is not ousted by the fact that, when the wrong was done on the vessel by the negligence of her master, she had completed her voyage and was securely moored at the wharf where her cargo was about to be discharged.

APPEAL from the Circuit Court of the United States for the District of Louisiana.

The case is stated in the opinion of the court.

Mr. John G. Carlisle for the appellants.

Mr. Charles W. Hornor for the appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is an appeal by the respondents in a suit in admiralty *in personam* from the decree therein. Leathers was the master of the steamboat "Natchez," and he and the other respondent were the owners of that vessel. The suit was brought in the District Court to recover damages for personal injuries received by Blessing, the libellant, on board of that vessel, and he had a decree in that court against the respondents *in personam*, and as owners of the vessel, and *in solido*, for $5,758.50, with five per cent interest from judicial demand till paid, and costs of suit. The respondents appealed to the Circuit Court. That court found the following facts: "1. That on the twenty-sixth day of December, A. D. 1873, the defendant therein, Thomas P. Leathers, was the master, and he and Mary Meeha, wife of Anthony Pauly, were the owners of the steamboat 'Natchez.' 2. That about 1 o'clock P. M. of said day the said steamboat 'Natchez' was lying at the wharf on the Mississippi, near the foot of Canal Street, in the city of New Orleans, securely moored to said wharf, and with at least one of her gangplanks out and resting on the shore, which afforded ingress and egress between the lower deck of said steamboat and the wharf.

3. That on the day and at the hour above mentioned the said steamboat had recently arrived at the port of New Orleans from a trip up the Mississippi River, having on board a large number of bales of cotton, and that the trip of said steamboat was completed, but her cargo was still to be discharged. 4. That a part of said cargo of cotton was stowed on the forward deck several tiers high, and a passageway was left from the end of the gang-plank to the foot of the stairs. This passageway was covered with bales of cotton piled on the bridging, and persons on shore who desired to go to the cabin or office of the steamboat could only do so by going along this passageway to the stairs, and up the stairs to the cabin and office. 5. That, after the landing of said boat, and after her gang-plank had been run ashore, so that persons could go from shore to said steamboat, the libellant went aboard of said steamboat, along said gang-plank, with the purpose of going up into her cabin or to her office. 6. That the master and officers of said steamboat were accustomed to permit persons expecting to find on said steamboat freight consigned to them, as soon as she had landed, and her gang-plank was out, to go aboard of her to examine the manifest or transact any other business with her master or officers. 7. That the libellant had business on said steamboat when he went aboard of her as aforesaid, he was expecting a consignment of cotton-seed by said steamboat, and went aboard to ascertain whether it had arrived. 8. That, when libellant was going through said passageway, and when near the foot of the stairs, on his way to the cabin or office of said steamboat, a bale of cotton fell from the upper part of said passageway against and upon the leg and ankle of libellant, causing a compound fracture of the bones of his ankle and leg. 9. That said bale of cotton was carelessly and negligently stowed, and was left in such a position that it was liable to fall upon persons going along said passageway to the foot of the stairs of said steamboat, and its position was known to the master of said steamboat. 10. That libellant was in no manner negligent or in fault, whereby he contributed to his said injury. 11. That the fracture of libellant's leg and ankle was such as to render amputation of his leg necessary, and his leg had to be and was amputated in consequence of the injury sustained by him.

as aforesaid.   12. That, at the time of his injury aforesaid, the libellant was thirty-eight years of age, and was earning in his business, which was buying cotton-seed, as agent for the Louisiana Oil Company, the sum of $750 per year.   13. That; at the time of said injury, the libellant was in good health, with a good character for sobriety and integrity.   14. That, in consequence of the injury sustained by him as aforesaid; the costs and expenses incurred by libellant for treatment, surgical services, and in and about his care and cure, amounted to the sum of seventeen hundred and seven dollars and fifty cents.   15. That the other damage resulting to libellant from said injury, consequent upon loss of time and the permanent disability caused by the loss of his leg, amounted to the sum of four thousand dollars.''   As a conclusion of law from the foregoing facts, the court found that the libellant ought to recover from the respondents the aggregate amount of said costs, expenses, and damage, with interest thereon, as additional damage, from the date of judicial demand, and it gave a decree in favor of libellant against the respondents for the said sum of $5,707.50, with interest at the rate of five per cent per annum from the date of judicial demand till paid, and costs of suit.   From that decree this appeal was taken by the respondents.

The only question raised by the appellants is as to whether the suit was one of admiralty jurisdiction in the District Court. They maintain that jurisdiction of the case belonged exclusively to a court of common law.   Attention is directed to the facts that the Circuit Court did not find that the libellant was an officer, seaman, passenger, or freighter, or that he had any connection with the vessel or any business upon her or about her, except that when he went on board of her he was expecting a consignment of cotton-seed by her, and went on board to ascertain whether it had arrived; and that the vessel had fully completed her voyage and was securely moored at the wharf at the time the accident occurred.   It is urged that the case is one of an injury received by a person not connected with the vessel or her navigation, through the carelessness or neglect of another person, and that the fact that the person guilty of negligence was at the time in control of a vessel which had been previously engaged in navigating waters within the jurisdiction

of the admiralty courts of the United States, cannot give juris-diction to such courts.

Although a suit might have been brought in a common-law court for the cause of action sued on here, the District Court, sitting in admiralty, had jurisdiction of this suit. The vessel was water-borne in the Mississippi River at the time, laden with an undischarged cargo, having just arrived with it from a voyage. The findings sufficiently show that her cargo was to be discharged at the place where she was moored. Therefore, although the transit of the vessel was completed, she was still a vessel occupied in the business of navigation at the time. The facts, that she was securely moored to the wharf, and had communication with the shore by a gang-plank, did not make her a part of the land or deprive her of the character of a water-borne vessel.

The findings state that the master and officers of the vessel were accustomed to permit persons expecting to find on the vessel freight consigned to them, as soon as she had landed and her gang-plank was out, to go on board of her to examine the manifest or transact any other business with her master or officers; that the libellant had business on her when he went on board of her under the circumstances set forth in the findings; that he was expecting a consignment of cotton-seed by her; and that he went on board to ascertain whether it had arrived. These findings show that not only did the libellant go on board for a purpose proper in itself, so far as he was concerned, but that he went substantially on the invitation of those in control of the vessel. It is not found that he knew of the custom referred to, but it is found that he was acting in accordance with such custom, and it is not found that he did not know of such custom. With the added fact that his business was that of buying cotton-seed, it is properly to be inferred that he went on board to inquire whether the vessel had brought the cotton-seed which he was expecting, because he knew of such custom. This makes the case one of invitation to the libellant to go on board in the transaction of business with the master and officers of the vessel, recognized by them as proper business to be transacted by him with them on board of the vessel at the time and place in question. Under such circum-

stances, the relation of the master and of his co-owner, through him, to the libellant, was such as to create a duty on them to see that the libellant was not injured by the negligence of the master. On the facts found there was a breach of that duty by the negligence of the master, constituting a maritime tort, of which the District Court had jurisdiction in this suit. Not only does the jurisdiction of courts of admiralty in matters of tort depend entirely on locality, but since the case of *Waring* v. *Clarke* (5 How. 441, 464), the exception of *infra corpus comitatus* is not allowed to prevail. Nor is the term " tort," when used in reference to admiralty jurisdiction, confined to wrongs or injuries committed by direct force, but it includes wrongs suffered in consequence of the negligence or malfeasance of others, where the remedy at common-law is by an action on the case. *Phila., Wil., & Balt. Railroad Co.* v. *Phil. & Havre de Grace Steam Towboat Co.,* 23 id. 209, 214, 215.

The decree of the Circuit Court will be affirmed, with costs and interest on the principal sum of $5,707.50 decreed by the Circuit Court, to be computed at the rate of five per cent per annum from the date of judicial demand in the District Court, paid ; and it is

*So ordered.*