United States Court of Appeals,

Eleventh Circuit.

No. 96-6833.

In re AMTRACK "SUNSET LIMITED" TRAIN CRASH IN BAYOU CANOT, ALABAMA, ON SEPTEMBER 22, 1993.

James ALTOSINO, Marie V. Altosino, John L. Anderson, Alice Anello, Joseph Anello, et al., Plaintiffs-Appellees,

v.

WARRIOR & GULF NAVIGATION COMPANY, Willie C. Odom, Andrew Stabler, CSX Transportation, Inc. and National Railroad Passenger Corp. d.b.a. Amtrak, Defendants-Appellants.

Sept. 11, 1997.

Appeals from the United States District Court for the Southern District of Alabama. (No. 94-5000-RV-C), Richard W. Vollmer, Jr., Judge.

Before BARKETT, Circuit Judge, HILL, Senior Circuit Judge, and HOWARD[*], Senior District Judge.

HOWARD, Senior District Judge:

In this admiralty action, which was consolidated by the Judicial Panel on Multidistrict Litigation, Appellants Warrior & Gulf Navigation Company ("WGN"), Willie C. Odom, Andrew Stabler, CSX Transportation, Inc. ("CSX"), and National Railroad Passenger Corp. ("Amtrak"), appeal from an adverse ruling by the district court that the Alabama wrongful death statute, Ala.Code § 6-5-410 (1993),[1] applied to all aspects of the wrongful death claims in this action under

---

[*]Honorable Alex T. Howard, Jr., Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

[1]Section 6-5-410 of the Alabama Code provides in pertinent part:

> (a)A personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama, and not elsewhere, for the wrongful act, omission, or negligence of any person, persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death.

> (b)Such action shall not abate by the death of the defendant, but may be revived against his personal representative and may be maintained though there has not been prosecution, conviction or acquittal of the defendant for the

the holding of *Yamaha Motor Corp., U.S.A. v. Calhoun,* --- U.S. ----, ----, 116 S.Ct. 619, 622, 133 L.Ed.2d 578 (1996). Appellants also appeal from the district court's ruling that the plaintiffs in the personal injury cases ("personal injury plaintiffs") may recover punitive damages and damages for loss of society and consortium. We vacate the decision of the district court on both grounds and remand this action for further consideration.

## I. Background

The incident giving rise to this action occurred in the early morning hours of September 22, 1993, in state territorial waters near the Port of Mobile, Alabama. At approximately 2:45 that morning, a commercial towing vessel named the M/V Mauvilla ("Mauvilla") was traveling north on the Mobile River pushing a tow of six loaded barges toward a destination some three hundred and fifty miles upriver. The vessel, owned and operated by WGN, was carrying a crew under the command of a captain and pilot.

Early in the voyage, the Mauvilla was enveloped by a heavy fog that had settled on the river. The pilot of the vessel, with his visibility of the waterway compromised, decided to secure the Mauvilla and wait for the fog to abate. However, while attempting to secure the Mauvilla to the river bank, the pilot allowed the vessel to veer into the mouth of Big Bayou Canot, a tributary of the Mobile River.

Unaware of what had transpired, and under the mistaken belief that he was still navigating in the Mobile River, the pilot continued to search for a place to secure the Mauvilla and its tow. While this task was being undertaken, an object appeared on the Mauvilla's radar screen which the

---

wrongful act, omission, or negligence.

(c) The damages recovered are not subject to the payment of the debts or liabilities of the testator or intestate, but must be distributed according to the statute of distributions.

(d) Such action must be commenced within two years from and after the death of the testator or intestate.

Ala.Code § 6-5-410 (1993).

pilot believed to be another vessel to which he could secure his vessel. That object was in fact a railroad bridge, owned and maintained by CSX, that crossed Big Bayou Canot.

As the pilot steered the Mauvilla toward the object, the tow struck a bridge support causing a portion of the railroad track to become laterally misaligned. Soon after, a passenger train, operated by Amtrak, derailed while attempting to traverse the damaged section of rail. Three locomotives, two passenger coaches, a crew dormitory car, and a baggage car, tumbled into the bayou, resulting in the death of forty seven persons on the train, numerous personal injuries, and extensive property damage to the train and bridge.

The crash precipitated the filing of over one hundred personal injury and wrongful death suits against WGN, the pilot and captain of the Mauvilla, CSX, and Amtrak. The Judicial Panel on Multidistrict Litigation consolidated these actions in the United States District Court for the Southern District of Alabama for all pretrial proceedings.

Because this action arose from an accident on navigable waters that involved both land-based and marine-based activity, the district court proceeded to determine as an initial matter the applicable law and the recoverable damages. By written Order of June 26, 1996, the district court entered its rulings with respect to these issues.

The trial court found that, while admiralty jurisdiction existed over this action, state law was to govern all aspects of the wrongful death claims. The district court also held that the personal injury claims in this action would be subject to the general maritime law which, the district court found, allowed the personal injury plaintiffs to pursue nonpecuniary damages that included loss of consortium, loss of society, and punitive damages. As to the claims asserted by CSX and Amtrak for property damage, the court ruled that these claims would be governed by admiralty law but would be limited to compensatory damages only.[2]

---

[2]On appeal, CSX and Amtrak argue that if the district court was correct in finding nonpecuniary punitive damages to be available for the personal injury claims under the general maritime law, then the court necessarily erred in limiting their property damage claims to compensatory damages. As we hold that nonpecuniary punitive damages are unavailable for the personal injury claims under the general maritime law, we find this argument moot.

By written Order of July 15, 1996, the district court amended its previous order and certified these rulings for immediate interlocutory appeal. This Court granted interlocutory review.

## II. Discussion

### A.

The main issue in this appeal is whether the district court erred in finding that Alabama's wrongful death statute governs the wrongful death claims asserted in this action. It is appellants' contention that the district court's ruling cannot stand because the Alabama wrongful death act conflicts with substantive admiralty law such that state law cannot be used by the plaintiffs as a source of relief under *Yamaha Motor Corp. v. Calhoun,* --- U.S. ----, ----, 116 S.Ct. 619, 622, 133 L.Ed.2d 578 (1996).

When this argument was raised below, the district court correctly observed that the Alabama wrongful death statute conflicts with federal maritime law in two significant respects. First, the general maritime law does not allow for the recovery of punitive damages except on a showing of willful and wanton misconduct in claims not relevant to this analysis. *See* discussion *infra.* On the other hand, the Alabama wrongful death statute allows for the recovery of punitive damages only, *King v. National Spa & Pool Inst., Inc.,* 607 So.2d 1241, 1246 (Ala.1992) (citing *Barnes v. Oswalt,* 579 So.2d 1319 (Ala.1991)), and permits the recovery of these damages on a showing of simple negligence, Ala.Code 6-5-391(a) (1993) (damages recoverable for "wrongful act, omission, *or negligence"* causing death) (emphasis added).

Second, federal maritime law requires that individual fault among tortfeasors be apportioned in collision and allision cases. *See, e.g., United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715-16, 44 L.Ed.2d 251 (1975); *Florida E. Coast Ry. Co. v. Revilo Corp.,* 637 F.2d 1060, 1063-64 (5th Cir.1981). Under Alabama law, however, apportionment of damages among joint tortfeasors is strictly forbidden. *See, e.g., Campbell v. Williams,* 638 So.2d 804, 809-10 (Ala.), *cert. denied,* 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994). It also prohibits actions for

contribution. *See, e.g., Consolidated Pipe & Supply Co. v. Stockham Valves & Fittings, Inc.,* 365 So.2d 968, 970 (Ala.1978).

Despite the presence of these conflicts, the district court concluded that the Alabama wrongful death statute applied to the wrongful death claims in this action. The district court reasoned that:

> Certainly, when ruling, the [*Yamaha*] Court clearly understood that the application of state wrongful death schemes to deaths occurring within territorial waters would introduce myriad inconsistencies into the law of maritime wrongful death. Specifically, the Court understood that there would be wide variations in the damages recoverable under those schemes.

Embodied within the district court's reasoning is the assumption that *Yamaha,* by allowing state law remedies in that case, implicitly accepted a necessary byproduct of its holding: that state wrongful death schemes would conflict with the general maritime law which, ultimately, must yield to state interests.[3] The district court's interpretation of *Yamaha* is mistaken.

### B.

In *Yamaha,* the Supreme Court held that its holding in *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which created a wrongful death action under the general maritime law, did not provide the exclusive remedies in cases involving the deaths of non-seamen in state territorial waters. *Yamaha,* --- U.S. at ----, 116 S.Ct. at 622. As explained by the *Yamaha* Court, *Moragne* represented an "extension of relief," driven by a "humane and liberal" purpose, that did not foreclose the availability of state law remedies in such cases. *Yamaha,* --- U.S. at ----, 116 S.Ct. at 627 ("*Moragne,* in sum, centered on the extension of relief, not on the contraction of remedies. The decision recalled that it better becomes the humane and liberal character of proceedings in admiralty to give rather than to withhold the remedy, when not required to withhold it by established and inflexible rules") (quotations and citations omitted).

---

[3]Citing *The Tungus v. Skovgaard,* 358 U.S. 588, 592-93, 79 S.Ct. 503, 506-07, 3 L.Ed.2d 524 (1959) and *Hess v. United States,* 361 U.S. 314, 320, 80 S.Ct. 341, 346, 4 L.Ed.2d 305 (1960), the district court found that the Alabama wrongful death statute would have to be applied as a whole, including the provisions which conflicted with admiralty law, as trial courts could not "pick and choose some portions of a state scheme and discard others."

To be sure, in reaching its decision the *Yamaha* Court was aware that a dual system of recovery would introduce into the general purview of admiralty law variations in damage awards and recoveries. Indeed, the Court expressly observed in *Yamaha* that "[v]ariations of this sort had long been deemed compatible with federal maritime interests." *Id.* at ----, 116 S.Ct. at 626 (citing *Western Fuel Co. v. Garcia,* 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921)).

However, it is equally certain that the *Yamaha* Court, while aware that its decision would create, to some extent, unavoidable conflict between state law and federal maritime law, did not intend to wholly sacrifice long-standing admiralty principles at the altar of states' rights. To the contrary, in *Yamaha* the Court confined its holding "to the modest question whether it was *Moragne'*s design to terminate recourse to state remedies," *id.* at ---- n. 8, 116 S.Ct. at 626 n. 8, but in answering that question in the negative, repeatedly urged that "[p]ermissible state regulation ... must be consistent with federal maritime principles and policies," *id.* at ---- n. 13, 116 S.Ct. at 628 n. 13 (citing *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373-74, 79 S.Ct. 468, 480-81, 3 L.Ed.2d 368 (1959)), such that "state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system," *id.* at ---- n. 8, 116 S.Ct. at 626 n. 8. (quoting *Romero,* 358 U.S. at 373, 79 S.Ct. at 480-81).

Thus, it is evident in *Yamaha* that the Court, while intent on protecting the state interests that were present in that particular case (a product liability action resulting from a recreational boating accident in territorial waters), was not concerned with overruling bedrock admiralty principles recognized in *Southern Pacific Company v. Jensen,* 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917), where the Court held that state law must yield if it "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." Indeed, since the birth of the *Jensen* doctrine in the early part of this century, the goals of uniformity and harmony in admiralty have survived to the present. *Yamaha,* by emphasizing these principles yet again, has affirmed their continuing vitality.

6

Consequently, it would be wrong to assume, as it appears the district court did in this case, that the holding in *Yamaha* embodies an unspoken rule that state interests must always trump competing admiralty principles when the two collide in state territorial waters. It is plain from the language in *Yamaha* that more is at issue in these situations; conflicts of this type must be resolved with a healthy regard for the needs of a uniform maritime law.

Of course, this balancing act—allowing state law remedies while being careful not to trample the general maritime law—is, by its nature, made more or less difficult by the particular facts of a case. As observed by the United States Court of Appeals for the Third Circuit in *Yamaha,* "determining whether federal maritime law conflicts with and thus displaces state law has proven to be extremely tricky.... " *Calhoun v. Yamaha Motor Corp., U.S.A.,* 40 F.3d 622, 628 (3d Cir.1994). "It would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence...." *Yamaha,* --- U.S. at ---- n. 8, 116 S.Ct. at 626 n. 8 (quoting *American Dredging Co. v. Miller,* 510 U.S. 443, 452, 114 S.Ct. 981, 987, 127 L.Ed.2d 285 (1994)).

Nowhere is the difficulty in drawing this line more evident than in the present case. Here, we have before us a state statute that is unique; the Alabama wrongful death statute is the only one of all the fifty states that provides for punitive damages only, *see Black Belt Wood Co. v. Sessions,* 514 So.2d 1249, 1262 (Ala.1986) (Maddox, J., concurring) (observing that Alabama is the only state in which wrongful death damages are purely punitive), and allows for the recovery of punitive damages on a showing of mere negligence, *see* discussion *supra.* Furthermore, the particular facts of this case implicate a variety of federal maritime interests that simply were not present in *Yamaha* and, as a result, do not lend themselves to direct analysis under that case.[4] Thus, we must steer to

---

[4]In *Yamaha,* the Court was asked to examine the potential application of the wrongful death and survival statutes of Pennsylvania and Puerto Rico. In doing so the Court never addressed whether these statutes were in conflict with any characteristic features of the general maritime law. The absence of conflicts analysis in *Yamaha* most likely is due to the fact that the Pennsylvania and Puerto Rico statutes were primarily remedial in nature. There was nothing in *Yamaha* from which it may be inferred that the application of these statutes threatened federal maritime principles or policies.

sources other than *Yamaha* for guidance in resolving the present conflict between the Alabama wrongful death statute and the general maritime law. That search necessarily takes us to *Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485 (11th Cir.1986).

In *Steelmet,* this Court summarized the task that we must undertake in determining whether to apply state law in this case. There, we explained that:

> One must identify the state law involved and determine whether there is an admiralty principle with which the state law conflicts.... If there is an admiralty-state law conflict, the comparative interests must be considered—they may be such that admiralty shall prevail ... or if the policy underlying the admiralty rule is not strong and the effect on admiralty is minimal, the state law may be given effect....

*Id.* at 1488 (citations omitted); *accord Brockington v. Certified Elec., Inc.,* 903 F.2d 1523, 1530 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991).[5] Applying *Steelmet* to the present action, we must balance Alabama's interests in having its wrongful death statute apply against the federal maritime law principles of uniformity and harmony.

It goes without saying that the State of Alabama has a sovereign interest in activities that occur within its territorial waters. *See Brockington,* 903 F.2d at 1530 (state interests include the interest in being permitted to regulate independently matters of local concern without interference by the federal government). Moreover, Alabama undoubtedly is interested in protecting its citizens and providing for those who have been injured by tortious acts committed within its borders. *See Yamaha,* 40 F.3d at 644 (state interests include policing territorial waterways and protecting citizens through tort systems). However, as significant as Alabama's interests may be, the federal maritime concerns that exist in this case tip the balance in favor of displacing state law insofar as the claims for wrongful death under the Alabama Wrongful Death Act are based upon simple negligence.

To begin with, the Alabama wrongful death statute conflicts with two fundamental admiralty law principles that bear directly on the rights and liabilities of the parties: (1) apportionment of

---

[5]The comparative interests analysis set forth in *Steelmet* is by no means novel. *See, e.g., Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *Exxon Corp. v. Chick Kam Choo,* 817 F.2d 307, 317-18 (5th Cir.1987), *rev'd on other grounds,* 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988); *Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171 (5th Cir.1975).

damages for joint tortfeasors, and (2) the applicable standard of liability for the recovery of punitive damages. *See* discussion *supra; cf. American Dredging,* 510 U.S. at 452-53, 114 S.Ct. at 987-88 (absence of conflict between state law and *substantive* maritime law or interest); *Brockington,* 903 F.2d at 1530-33 (same); *Steelmet,* 779 F.2d at 1490-91 (same). That substantive admiralty law rights are being threatened in this case is a critical factor in considering the relative weight of federal maritime interests. *See American Dredging,* 510 U.S. at 452-53, 114 S.Ct. at 987-88 (using distinction between substantive and procedural rights in deciding applicability of state law); *see also Pope & Talbot v. Hawn,* 346 U.S. 406, 409, 74 S.Ct. 202, 204-05, 98 L.Ed. 143 (1953) (admiralty's comparative negligence rule barred application of state contributory negligence rule); *Kossick,* 365 U.S. at 742, 81 S.Ct. at 893 (federal maritime rule validating oral contracts precluded application of state Statute of Frauds); *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 248-49, 63 S.Ct. 246, 252-53, 87 L.Ed. 239 (1942) (federal maritime rule allocating burden of proof displaced conflicting state rule). Indeed, the Supreme Court has warned that states "may not deprive a person of any substantial admiralty rights as defined ... by interpretative decisions of this Court." *Pope,* 346 U.S. at 410, 74 S.Ct. at 205. Thus, in a case like the present, where substantive admiralty principles are placed at risk by the potential application of state law, there is "no leeway for variation or supplementation by state law," *Yamaha,* --- U.S. at ----, 116 S.Ct. at 626 (citing some above cases), insofar as the claims for wrongful death under the Alabama Wrongful Death Act are based upon simple negligence.

Additionally, the facts of this case are so closely related to activity traditionally subject to admiralty law that the reasons for applying federal maritime law in this case are undeniably present. In sharp contrast to *Yamaha,* which was a products liability action arising from a recreational jet ski accident, the present action bears a substantial connection with traditional maritime activity. Here, we do not have a case involving a pleasure craft, or an airplane falling into navigable waters, but a case involving an allision of a commercial tug and tow with a railroad bridge, that took place in the ordinary course of maritime business, on a waterway subject to heavy commercial traffic.

9

Moreover, in contrast to the jet ski collision in *Yamaha,* the allision in our case substantially disrupted the flow of maritime commerce. Thus, the facts of this case, unlike those in *Yamaha,* give rise to federal maritime interests that are decidedly commercial in nature. Accordingly, the actors in this case are entitled to the application of a body of laws—maritime laws—that have been fitted over the years for just these types of situations.

Finally, federal maritime law should be applied here because Congress, in passing the Admiralty Extension Act ("Act"), 46 U.S.C. § 740 (1975), made clear its intent that in situations involving an allision between a vessel and a shore object, such as a railroad bridge, state laws should yield to federal maritime law. The general rule before the passage of the Act was that ship-to-shore tort claims were not maritime claims to be heard in the admiralty courts, but were instead common law claims triable in state court and governed by state law. *The Admiral Peoples,* 295 U.S. 649, 651, 55 S.Ct. 885, 886, 79 L.Ed. 1633 (1935). Bridges, wharves, and the like were viewed as extensions of land. *Nacirema Operating Co. v. Johnson,* 396 U.S. 212, 214-15, 90 S.Ct. 347, 348-50, 24 L.Ed.2d 371 (1969).

The Admiralty Extension Act extended admiralty jurisdiction to cover "all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. § 740 (1975). It is clear from its legislative history that the primary purpose of the Act was to eliminate the inconsistent and unfair results that could arise from adjudicating the cross claims in allision cases according to different and conflicting legal principles.

> As a result of the denial of admiralty jurisdiction in cases where injury is done on land, when a vessel collides with a bridge through mutual fault and both are damaged, under existing law the owner of the bridge, being denied a remedy in admiralty, is barred by contributory negligence from any recovery in an action at law. But the owner of the vessel may by a suit in admiralty recover half damages from the bridge, contributory negligence operating merely to reduce the recovery.... The bill under consideration would correct these inequities.

*See* Sen. Rep. No. 1593, 80th Cong., 2d Sess., *reprinted in* 1948 U.S.Code Cong. Serv. 1898. In light of this legislative history, many courts subsequently have suggested, and some have explicitly stated, that a claim cognizable in admiralty by virtue of the Admiralty Extension Act is governed

10

by the general maritime law.  *See, e.g., Gutierrez v. Waterman S.S. Corp.,* 373 U.S. 206, 209-210, 83 S.Ct. 1185, 1187-88, 10 L.Ed.2d 297 (1963);  *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 208-11, 92 S.Ct. 418, 422-25, 30 L.Ed.2d 383 (1971);  *Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204, 212 (5th Cir.1968);  *Pryor v. American President Lines,* 520 F.2d 974, 979-80 (4th Cir.1975).

In sum, applying the Alabama wrongful death act in this case so as to allow recovery for wrongful death based upon simple negligence only would deprive the litigants of substantive admiralty rights that must be applied given the exceedingly commercial nature of this incident. Moreover, application of such feature of Alabama law under the present facts would run counter to Congress' intent that admiralty law govern suits involving ship-to-shore allisions.

Accordingly, as the federal maritime interests present in this action outweigh Alabama's interests in having its wrongful death statute apply in its entirety, we hold that the district court erred in applying the Alabama wrongful death statute to the wrongful death claims in this action insofar as such Alabama statute provides for the recovery of punitive damages for simple negligence only and prohibits apportionment of fault and damages among joint tortfeasors.

In the case of *American Dredging Co. v. Lambert,* 81 F.3d 127, 130 (11th Cir.1996), this Court held that *Yamaha, supra,* extended the right of recovery in wrongful death cases to the nonpecuniary remedies afforded by the Florida Wrongful Death Act to actions for wrongful death to non-seamen occurring in state territorial waters.  The plaintiffs in the wrongful death actions have available to them the remedies provided in *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).  In addition, although such plaintiffs cannot recover punitive damages for simple negligence, they may recover punitive damages upon a showing of "intentional or wanton and reckless conduct" on the part of defendants amounting to "a conscious disregard of the rights of others." *CEH, Inc. v. F/V Seafarer,* 70 F.3d 694, 699 (1st Cir.1995).  This is because the standard of liability necessary for the recovery of punitive damages is governed by admiralty law.  Alabama law provides only the remedy which under *Yamaha* is now available to these wrongful death claimants in admiralty.

C.

Appellants also contend that the district court erred in finding that the personal injury plaintiffs in this action may seek nonpecuniary damages under the general maritime law for loss of society, loss of consortium, and punitive damages. We agree with Appellants' contention.

Appellees suggest that *Yamaha* somehow extended state law remedies to personal injury actions to non-seamen occurring in state territorial waters. First, *Yamaha* dealt only with wrongful death actions and has no relevance to personal injury actions. Second, the historical basis for wrongful death actions in admiralty is entirely separate from that for personal injuries, quoting from *Gilmore And Black, The Law Of Admiralty, Second Edition,* Chapter VI, § 6-29:

> In the [sic] Harrisburg[6] the Supreme Court held that no cause of action for wrongful death was provided by the general maritime law. In The Hamilton, which involved a high seas collision between ships owned by Delaware corporations, the Court held that the gap in the maritime law created by The Harrisburg could be filled by allowing a recovery for wrongful death under a statute of the State of Delaware. Then or later statutes providing recovery for wrongful death were enacted in all states. On March 30, 1920, Congress enacted the Death on the High Seas Act (DOHSA) which provided a recovery for death "caused by wrongful act, neglect or default occurring on the high seas beyond a marine league from the shore of any State [Territory or dependency]." On June 5, 1920, Congress enacted the Jones Act which incorporated the wrongful death provisions of the Federal Employers' Liability Act [FELA]. DOHSA and the Jones Act, enacted almost simultaneously, were hopelessly inconsistent with each other both as to the nature of the wrongful death recovery and as to the classes of beneficiaries entitled to recover. From 1920 until 1970 the lower federal courts, with occasional help from the Supreme court, attempted to impose a degree of order on this statutory chaos. In 1970 the Supreme Court overruled The Harrisburg in Moragne v. States Marine Lines, Inc. and held, in a unanimous decision, that a remedy for wrongful death was provided by the general maritime law. (Footnotes omitted).

Although Congress provided for remedies for wrongful death on the high seas (DOHSA) and for wrongful death to seamen (*The Jones Act),* Congress has never provided a remedy for wrongful death to non-seamen in state territorial waters.[7] Therefore, prior to *Moragne,* the admiralty courts looked to the state wrongful death actions to provide a remedy in such actions, and that situation

---

[6]*The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886).

[7]Congress has provided for death benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.,* but such act is not relevant to the Court's rationale.

existed until 1970 when the Supreme Court decided *Moragne* which for the first time gave an admiralty common law right of action for wrongful death of non-seamen in state territorial waters.

Twenty-six years later, the Supreme Court in *Yamaha* interpreted *Moragne* as adding remedies and not deleting any remedies which existed prior to *Moragne.* Admiralty remedies for personal injury existed prior to *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). *See Leathers v. Blessing* 105 U.S. 626, 15 Otto 626, 26 L.Ed. 1192 (1881). Therefore, there was no need to look to state law for remedies in the case of non-seamen injured in state territorial waters and no need for a *Moragne* decision or a *Yamaha* decision. Unless or until the United States Supreme Court should decide to add state remedies to the admiralty remedies for personal injury, personal injury claimants have no claim for nonpecuniary damages such as loss of society, loss of consortium or punitive damages, except in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman, intentional denial of a vessel owner to furnish a seaworthy vessel to a seaman and in those very rare situations of intentional wrongdoing. We are aware of no decision in the Supreme Court or in any of the circuit courts which has authorized punitive damages in a personal injury case.

In *Lollie v. Brown Marine Serv., Inc.,* 995 F.2d 1565, 1565 (11th Cir.1993), we looked disfavorably on the availability of nonpecuniary damages under the general maritime law. Specifically, we held that "neither the Jones Act nor general maritime law authorizes recovery for loss of society or consortium in personal injury cases." *Id.*

Today, we expressly extend our holding in *Lollie* to preclude the availability of punitive damages in personal injury actions brought under the general maritime law. Accordingly, we vacate the district court's ruling that the personal injury plaintiffs in this action are entitled to pursue such nonpecuniary damages.

III. Conclusion

13

For these reasons, we VACATE the order of the district court and REMAND this action for additional consideration not inconsistent with this opinion.[8]

HILL, Senior Circuit Judge, specially concurring:

We have, here, undertaken to lay down controlling law to govern further proceedings in some one hundred or more litigations. I am persuaded that the opinion now prepared for us by Judge Howard is the correct resolution of this task.

We have followed the channel markers and beacons as well as we ascertain them to be, but between *The Harrisburg, Moragne,* and *Yamaha,* and interstitially open between the *Death on the High Seas Act* and the *Jones Act,* there are some unchartered waters.

Under such circumstances, the M/V Mauvilla took a wrong turn into Big Bayou Canot. Its skipper should have kept it in the Mobile River.

We trust that we have not made a similar wrong turn. We do not wish to steer one hundred cases into unmarked obstructions. Being persuaded that we have not done so, I am pleased to concur.

---

[8]The motion for expedited ruling, filed in this appeal, is denied as moot.