# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-2767

_____

| | |
|---|---|
| Arkansas State Highway Commission, | * |
| | * |
| Plaintiff, | * |
| | * |
| | * |
| v. | * |
| | * |
| Arkansas River Company, | * |
| | * |
| Appellee; | * |
| | * |
| United States of America, | * |
| | * |
| Appellant. | * |
| | * |

_____

No. 00-2834

_____

| | |
|---|---|
| Arkansas State Highway Commission, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| Arkansas River Company; United States of America, | * |
| | * |
| Appellees. | * |

Appeals from the United States District Court for the Eastern District of Arkansas.

_____

No. 00-2837
_____

Arkansas State Highway Commission,       *
                                         *
            Appellee,                    *
                                         *
     v.                                  *
                                         *
Arkansas River Company,                  *
                                         *
            Appellant;                   *
                                         *
United States of America,                *
                                         *
            Appellee.                    *
                                         *


_____

Submitted: April 12, 2001

Filed: October 16, 2001
_____

Before HANSEN, MAGILL, and MURPHY, Circuit Judges.
_____

HANSEN, Circuit Judge.

The Arkansas State Highway Commission (Commission) initiated this maritime action to recover the expenses it incurred in repairing the bridge that spans the Mississippi River at Helena, Arkansas. The bridge was damaged when the Arkansas River Co.'s pushboat, the <u>M/V James R. Hines</u> (<u>Hines</u>), rammed a dragline barge into the underside of the bridge. Following a bench trial, the district

2

court[1] found that the Arkansas River Co. was liable to the Commission for the damage to the bridge. The district court further found that the Arkansas River Co. was entitled to 100% contribution from the United States because the United States Army Corps of Engineers (Corps), the owner of the barge, failed to tender the barge to the Hines' captain in a condition that would have permitted it to pass safely under the bridge. The United States and the Commission appeal.[2] We affirm.

## I. Facts and Background

The Corps entered into a 14-week time charter with the Arkansas River Co. on July 11, 1997, engaging the services of the company's 2400-horsepower pushboat, the Hines, and the Hines' crew. A time charter is a maritime contract providing that the chartered vessel's owner navigates, operates, and maintains the chartered vessel, but the chartering party directs the work the vessel is to perform, including the routes it will take, during the charter period. See Interocean Shipping Co. v. M/V Lygaria, 512 F. Supp. 960, 964 (D. Md. 1981).

Pursuant to the charter, the Corps directed the Hines to transport six Corps barges, including the Corps' dragline barge, the Odum, from Greenville, Mississippi, up the Mississippi River to Memphis, Tennessee. A dragline is an excavating machine that has a bucket attached by cables to the end of a long boom. The bucket is filled by using the cables to draw the bucket toward the machine. The Odum has a two-position boom which can be maintained at either a $15^{\circ}$ or $30^{\circ}$ angle. At the $15^{\circ}$ angle, the boom's tip is 75 to 80 feet above the water, whereas at

_____

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

[2]The Arkansas River Co. filed a notice of cross appeal but has not briefed any issues for our review as a cross appellant.

3

the 30$^\circ$ position, the tip is 110 to 120 feet above the water. The Corps also directed its own 760-horsepower pushboat, the <u>Singleton</u>, to assist the <u>Hines</u> in transporting the flotilla to Memphis.

On July 13, 1997, the Corps' employees in Greenville were preparing the <u>Odum</u> for transport under the direction of Walter Fuquay. Fuquay initially directed the employees to lower the <u>Odum</u>'s boom to its 15$^\circ$ position, but Charles Cates, acting chief of the grading unit at Greenville, told Fuquay that the boom did not need to be lowered. Fuquay and the <u>Singleton</u>'s captain, David Bradford, questioned Cates' decision because they were concerned the <u>Odum</u> would not pass under the bridge at Helena, Arkansas, with the boom in its 30$^\circ$ raised position. Cates asked Captain Bradford to verify his height computations at the Helena bridge. Based on the river stage projections Cates provided to Bradford, Bradford also determined that the <u>Odum</u> would clear the bridge, and Cates issued a direct order not to lower the boom. Lowering the <u>Odum</u>'s boom is not a simple process. It apparently takes a well-trained crew of no less than four people three to four hours to complete the process. There was testimony at trial that lowering the boom is a dangerous process, which cannot be undertaken once the <u>Odum</u> is unmoored.

Captain Jay Foster, an Arkansas River Co. employee, arrived the following day with the <u>Hines</u> to pick up the Corps' flotilla. Captain Foster made a customary inspection of the entire tow by walking around it. He noted during the inspection that the Corps' employees had secured the <u>Odum</u>'s boom for transport, that the boom appeared to him to be in the 15$^\circ$ position, and that the boom looked to be about 80 feet above water. That same morning, Captain Foster had calculated that there was 104 feet of clearance at the Helena bridge based on that morning's river stage, and thus he erroneously assumed the <u>Odum</u>'s boom would clear. Before departing, Captain Foster asked Cates whether there were any special instructions, and Cates responded that there were not. Captain Foster was never informed by Cates or Captain Bradford that the <u>Odom's</u> boom had not been lowered.

4

The trip from Greenville was uneventful until the flotilla reached the Helena bridge at around 8:30 p.m. on July 15, 1997. As the Hines and the Singleton pushed the flotilla under the bridge, the Odum's boom struck the bridge's underside, knocking loose most of the bridge's underlying steel support structure. To cover the costs of repair, the Commission applied to the United States Department of Transportation (DOT) for repair funds under the Emergency Relief program. The DOT approved the application and set aside $500,000 in emergency funds to be used by the state. To receive the emergency funds, however, the Commission had to enter into a written agreement with the DOT to recover the costs of repair from the parties who were legally responsible for the damage and to reimburse the DOT from any recovered funds. See 23 C.F.R. § 668.105(f) (requiring a state which receives funds to undertake "prompt and diligent efforts" to recover repair costs from those who are legally responsible for the damage). The Commission repaired the Helena bridge in one month, stipulating at trial that the total cost of repair was $248,172. For a reason undisclosed in the record, the Commission claimed only $216,045 in emergency relief funds from the DOT. The Commission paid the remaining $32,128 in repair costs out of state funds.

The Commission then filed this suit against the Arkansas River Co. and the Corps, seeking to invoke the district court's admiralty jurisdiction under 28 U.S.C. § 1333 and the Admiralty Jurisdiction Act, 46 U.S.C. App. § 740. The Commission alleged that the Arkansas River Co. and the Corps were jointly and severally liable for the repair costs. The Arkansas River Co. filed a cross-claim seeking contribution from the United States. The Corps moved to dismiss the Commission's claim on the ground that the Corps was not a proper party to the suit, and the Commission sought leave to amend its complaint to name the United States as a proper party.

The district court granted the Corps' motion, reasoning that the Commission's claims arising out of the Corps' alleged negligence could only be brought against the United States itself under the Suits in Admiralty Act (SAA), 46 U.S.C. App. §§ 741-52, which, among other things, waives sovereign immunity for all maritime claims arising out of the United States' ownership or operation of a vessel, see id. § 742. Under the SAA, a party may maintain suit against the United States in personam only, and the district court therefore ruled that it lacked jurisdiction over the Corps. The district court denied the Commission's motion to amend, however, because it found that the Commission's contractual obligation with the DOT essentially created a situation where the court was being asked to settle a dispute between the DOT and the United States. The district court concluded that no authority authorized suit in federal court between an agency of the United States and the United States itself. (See district court's order denying summary judgment, J.A. at 56-57 (explaining the court's earlier action).)

At the beginning of the bench trial, the Commission moved for judgment as a matter of law against the Arkansas River Co. based on the rebuttable presumption that a moving vessel is at fault when it strikes a stationary object. See, e.g., Folkstone Mar., Ltd. v. CSX Corp., 64 F.3d 1037, 1050 (7th Cir. 1995). The district court granted the motion and entered judgment against the Arkansas River Co. for the total amount of the repairs, $248,172, and awarded prejudgment interest on the $32,128 of the state's funds actually expended by the Commission to repair the bridge.

The remainder of the trial involved the Arkansas River Co.'s cross-claim for contribution from the United States. At the trial's conclusion, the district court found that the Corps was 100% at fault for the damage to the bridge because the Corps had a duty to make the Odum seaworthy before turning the vessel over to Captain Foster. It rejected the government's argument that the Odum's unseaworthiness, the raised boom, was so obvious that Captain Foster's failure to

notice it rendered the Arkansas River Co. entirely liable. Based on its findings, the district court entered judgment in favor of the Arkansas River Co. against the United States for the entire amount of the Arkansas River Co.'s liability to the Commission, i.e., $248,172.

## II. Discussion

The government argues that the district court erred in entering judgment in favor of the Arkansas River Co. on the contribution claim because it contends Captain Foster had a duty to ascertain the height of the Odum's boom with certainty, rendering the Arkansas River Co. entirely liable for his failure to do so. It also argues that the district court lacked jurisdiction over the contribution claim for the same reason the district court refused the Commission's attempt to bring suit against the United States. Of course, the Commission argues that it was entitled to name the United States as a proper party in its suit to recover for all of its repair costs.

## A. Arkansas River Co.'s Liability

Our review of whether the Arkansas River Co. should have shouldered at least some of the liability for the allision is limited by the position the government took at trial. The district court indicated at the close of the evidence that it was inclined to find that the Corps failed to secure the Odum's boom in a manner that would render the vessel fit to pass under the Helena bridge (that is, that it tendered the Odum in an unseaworthy condition). It also indicated it was inclined to find that Captain Foster had some duty to find out whether the boom was in the up or down position, even though it was not obvious during Captain Foster's inspection that the boom's height rendered the Helena bridge impassable. After informing counsel of its tentative findings, the district court explained that it was going to compare the parties' fault but that it would give them an opportunity to argue how

7

the fault was to be apportioned. The government's counsel responded that he did not believe that fault could be divided because, as he understood it, the warranty of seaworthiness is an all-or-nothing concept of absolute liability. According to the government's counsel, if the damage to the bridge was caused by the Odum's unseaworthy condition, the government was entirely liable unless the condition should have been obvious to Captain Foster. (J.A. at 313-14.) Based on the government's concession, the district court found that the raised boom was not obvious to Captain Foster and entered judgment in the Arkansas River Co.'s favor for the entire amount of damages.

In an allision case such as this one, a court is not constrained to apportion fault on an all-or-nothing basis as the government argued, and the district court was not foreclosed from applying comparative fault in light of its findings. The warranty of seaworthiness stems from the proposition that a tug is not a bailee or insurer of a barge in its tow. Nat G. Harrison Overseas Corp. v. Am. Tug Titan, 516 F.2d 89, 94 (5th Cir.), modified, 520 F.2d 1104 (5th Cir. 1975). In other words, the owner of the tow is responsible for the seaworthiness of its own vessel. Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1057 (4th Cir. 1969). The warranty generally arises in the tug/tow context when damages are sought for the loss of a barge in tow, or the loss of its cargo, and the dispute arises over whether the loss was occasioned because of an unseaworthy condition. See, e.g., King Fisher Marine Serv., Inc. v. NP Sunbonnet, 724 F.2d 1181 (5th Cir. 1984); Associated Dredging Co., v. Cont'l Marine Towing Co., 617 F. Supp. 961 (E.D. La. 1985); Falcon Constr. Co. v. Bacon Towing Co., 613 F. Supp. 221 (S.D. Tex. 1985), aff'd, 797 F.2d 975 (F.2d 975 (5th Cir. 1986) (unpublished). The law imposes a duty on the tug operator to protect the tow from loss which results from the tow's unseaworthy condition, but only if the unseaworthiness is "so apparent that it would be negligent for the tow to attempt to proceed." King Fisher Marine Serv., 724 F.2d at 1184. Only in this narrow circumstance does the law require a

8

tug operator to protect the tow or its cargo from loss caused by an unseaworthy condition.

Although a tug operator may discharge its duty to protect the tow from an unseaworthy condition by conducting a reasonable inspection, that fact alone does not insulate the tug owner from an obligation to avoid harm to others if that harm is reasonably avoidable. Cf. Folkstone Mar., Ltd., 64 F.3d at 1046 (stating that the standard for determining liability in an allision case is "whether, judged against the standard of good and prudent seamanship, the allision could have been prevented by the exercise of due care"). As a consequence, the district court could have found, as it apparently intended to find, that the boom rendered the Odum unseaworthy, that Captain Foster satisfied the duty he owed to the Corps by conducting a reasonable inspection, but that he should have done more to insure that he did not strike the bridge with the Odum's boom. Such findings would certainly be consistent with our view that both the Corps' conduct and Captain Foster's conduct proximately caused the bridge damage, and the parties' fault should have been apportioned. Following United States v. Reliable Transfer Co., 421 U.S. 397 (1975), the rule of comparative fault applies in an allision case where the concurrent negligence of two or more parties results in the damage that is the subject of the suit. See, e.g., In re Amtrack "Sunset Ltd." Train Crash in Bayou Canot, Ala., on Sept. 22, 1993, 121 F.3d 1421, 1423 (11th Cir. 1997), cert. denied, 522 U.S. 1110 (1998); Hanover Ins. Co. v. Puerto Rico Lighterage Co., 553 F.2d 728, 730-31 (1st Cir. 1977) (rejecting argument that tug operator is absolved of liability where unseaworthy condition was not obvious).

Rather than asking the court to compare fault, though, the government urged the court to decide this case along the lines of two other allision cases where barge cranes had allided with bridges, In re J.E. Brenneman Co., 782 F. Supp. 1021 (E.D. Pa. 1992), and Ryan Walsh Stevedoring Co. v. James Marine Serv., Inc., 557 F. Supp. 457 (E.D. La. 1983), aff'd, 729 F.2d 1457 (5th Cir.) (unpublished decision),

cert. denied, 469 U.S. 981 (1984).  In both cases, the district courts imposed 100% liability on the tug operators because the tug captains failed to undertake a reasonable inspection of the crane barges.  Regardless of the outcome of those cases, we do not find them to be inconsistent with our view that comparative fault principles should have been applied in this case.  Instead, the decisions suggest that a tug operator's failure to conduct a reasonable investigation that would have alerted the tug operator to the raised boom may amount to a superceding cause absolving the barge owner from liability for its failure to lower the boom.  As our court held in Lone Star Indus., Inc. v. Mays Towing Co., 927 F.2d 1453, 1459 (8th Cir. 1991), the concept of superceding cause survived the Supreme Court's adoption of comparative fault in admiralty cases.  Similarly, nothing in In re J.E. Brenneman or Ryan Walsh suggests that a court must impose 100% liability on the barge owner where a reasonable tug operator would not have found the boom's height to be obvious, which is what the government's counsel told the court it had to do based on the court's tentative findings.

Despite our concerns over the posture in which this case has arrived at our judicial doorstep, the government can not complain about the district court's alleged error when its representative asked for that rule to be applied.  See Dillon v. Nissan Motor Co., 986 F.2d 263, 269 (8th Cir. 1993) (recognizing that there can be no reversible error where the error is invited).  For that reason, our review on the government's appeal is limited to ascertaining whether the district court's unseaworthiness finding and its finding that the boom's height was not obvious to Captain Foster are clearly erroneous.  See McAllister v. United States, 348 U.S. 19, 20 (1954); Folkstone Mar., Ltd., 64 F.3d at 1046 ("Questions of negligence in maritime cases are treated as factual issues, and are accordingly subject to [the clearly erroneous] standard of review.").

The government argues that the raised boom did not render the Odum unseaworthy because the vessel could be transported with the boom in either the up

or down position. Many courts have said that the tow owner has a duty to tender a vessel that is "sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage." See, e.g., Shebby Dredging Co. v. Smith Bros., Inc., 469 F. Supp. 1279, 1284 (D. Md. 1979). But the obligation to provide a seaworthy vessel goes beyond providing a structurally sound one. The duty requires the tow owner to prepare the vessel, including its appurtenances, in such a way that the tug operator will be able to successfully negotiate the conditions and obstacles that the tow will encounter. Whether a party has met its obligation must be adjudged "by reference to the vessel's intended voyage, the hazards likely to be encountered, and the vessel's ability to withstand these hazards." Am. Home Assurance Co. v. L & L Marine Serv., Inc., 875 F.2d 1351, 1354 (8th Cir. 1989). The concept therefore is directly related to the task the tow owner has contracted with the tug operator to undertake. "A vessel that is seaworthy for one purpose is not necessarily seaworthy for another." Philip N. Davey, The Tug and Tow Relationship in the United States, 70 Tul. L. Rev. 475, 493 (1995). Thus, just because the Odum would float does not mean it was adequately prepared for its intended journey to Memphis. (If the Corps did not lower the boom, then how was it to be lowered?) Our review satisfies us that the district court committed no error in determining that the Corps had a duty to lower the boom and that the Odum was unseaworthy for its journey up river under the Helena bridge.

The district court also was not clearly erroneous in finding that the boom's height did not create an obvious concern, even though the court found it to be a "close call." Requiring a tug operator to notice obvious conditions of unseaworthiness imparts no obligation upon him to conduct a detailed inspection of the tow. See Nat G. Harrison, 516 F.2d at 94. Instead, the tug operator's "duty to inquire and the quality, kind and scope of [a particular] inspection vary with the circumstances of each case." South, Inc. v. Moran Towing and Transp. Co., 360 F.2d 1002, 1006 (2d Cir. 1966). The government suggests Captain Foster should have done more to ascertain the boom's height, specifically, that he should have

viewed the <u>Odum</u> from the river's bank to get a better view of the boom's angle. The district court rejected the argument, as do we.  On the morning that Captain Foster picked up the flotilla, he checked on the river stages, and he ascertained the vertical clearance at the Helena bridge.  He also conducted a thorough walk-around inspection of the entire flotilla, including the <u>Odum</u>.  From the <u>Odum</u>'s deck he viewed the height of the boom, and he determined that the crane was properly secured in what Captain Foster termed the "transit position."  He testified that he had transported the <u>Odum</u> under the Helena bridge on several previous occasions, that the Corps had always lowered the boom on those occasions, and that the height of the <u>Odum</u> did not appear to be different on this trip.  He also asked Cates before departing whether there was anything "unusual" about the tow.  Cates said no.  Under these facts, Foster's inspection was sufficient to apprise him of any "obvious" condition, and given the testimony at trial about the difficulty of determining the height of the boom from the <u>Odum</u>'s deck, we decline to second-guess the district court.

Taking a different tack, the government argues that the district court failed to presume under the <u>Pennsylvania</u> rule that Captain Foster's conduct was the cause of the bridge accident.

> Under the <u>Pennsylvania</u> rule, if a vessel involved in a collision was violating a statutory rule intended to prevent collisions, the burden shifts to the violating vessel to show that its fault could not have been a cause of the accident. <u>See</u> <u>The Pennsylvania</u>, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873); <u>see also</u> <u>Garner v. Cities Serv. Tankers Corp.</u>, 456 F.2d 476, 480 (5th Cir.1972). The rule thus creates a presumption that one who violates a regulation intended to prevent collisions will be deemed responsible; but that presumption is rebuttable.

<u>Tokio Marine & Fire Ins. Co., v. Flora MV</u>, 235 F.3d 963, 966 (5th Cir. 2000). The government contends that Captain Foster violated two Inland Navigation Rules while attempting to negotiate the Helena bridge, which required the district

court to presume that Captain Foster was at fault for the allision. We decline to reach this issue, however, because the government presented no evidence of any statutory violations on Captain Foster's part, nor did it argue at trial that the Pennsylvania presumption of fault applied. See Entergy, Ark., Inc. v. Nebraska, 241 F.3d 979, 986 n.1 (8th Cir. 2001) (declining to reach issue raised for the first time on appeal), cert. denied, 2001 WL 872940 (U.S. Oct. 1, 2001).

## B. Jurisdiction over Claims Against the United States

We turn next to the Commission's argument that it should have been permitted to bring suit against the United States. As a practical matter, we see little point to the Commission's position because its judgment against the Arkansas River Co. fully covers the amount the Commission expended to repair the bridge, and the cross-claim judgment against the United States held by the Arkansas River Co. insures that it will have the funds to pay the Commission. Regardless of the outcome, the point posited merely implicates from whose pocket the Commission will recover its damages. Nevertheless, we conclude that the district court did not err in denying the Commission's motion to add the United States as a proper party.

It is stated often in our decisions that the government is not subject to suit unless it has consented to be sued. See, e.g., Miller v. Tony and Susan Alamo Found., 134 F.3d 910, 915 (8th Cir. 1998). That consent usually comes in the form of a particular statute enacted by Congress, such as § 742 of the SAA, the purported basis for the district court's jurisdiction over the government in this case. Courts must strictly scrutinize any statutory waiver to ensure that Congress intended to authorize the suit, and the waiver must be "unequivocally expressed" in the statute. Miller, 134 F.3d at 915. "Courts are not free to extend or restrict waivers of sovereign immunity beyond what Congress intended." Manypenny v. United States, 948 F.2d 1057, 1063 (8th Cir. 1991).

13

The Commission argues that the district court should not have considered the existence of the DOT's emergency relief funds in making its finding that jurisdiction did not exist for a claim by the Commission against the United States. Because the district court's subject matter jurisdiction was at issue, however, the court was entitled to look beyond the pleadings and beyond the caption in ascertaining the substance of the Commission's claim against the government.[3] And when the emergency relief funds are considered, the Commission's claim, as the district court found, was essentially a claim by the DOT to recover from the United States. Given the unique situation presented by the facts of this case, we agree that Congress did not intend to authorize the Commission's suit against the government under the SAA. Cf. Dep't of Army v. Fed. Labor Relations Auth., 56 F.3d 273, 275-76 (D.C. Cir. 1995) (rejecting argument that sovereign immunity is inapplicable in a "government-against-government situation"). The Commission argues that even if we agree with the district court, it was still entitled to bring suit against the United States to recover the $32,128 in repair costs it expended out of state funds. The Commission has not briefed the basis or nature of the government's liability for such a claim, and it will nevertheless recover the $32,128 from the Arkansas River Co. once it executes on its judgment. The $32,128 is also included in the contribution judgment that the Arkansas River Co. holds against the government. We therefore decline to consider the argument.

The government argues on appeal that the district court lacked jurisdiction over the Arkansas River Co.'s contribution claim on this same basis. The Arkansas River Co., however, does not stand in the same shoes as the Commission. The Arkansas River Co. did not bring its cross-claim on behalf of the DOT. Rather, the Arkansas River Co. brought the cross-claim contribution action to ensure that it was not saddled with liability for which the Corps was responsible. Thus, the same government-versus-government rationale is inapplicable.

---

[3]Contrary to the Commission's argument, the collateral source rule does not require otherwise; it has no bearing on the jurisdictional inquiry.

## C. Prejudgment Interest

Finally, the Commission seeks prejudgment interest on the entire costs to repair the bridge, arguing that the district court abused its discretion in limiting the interest award to the Commission's out-of-pocket expenditures of $32,128. As a general rule, prejudgment interest should be awarded in admiralty suits to ensure that the injured party is fully compensated for its loss, the goal being to restore that party to its position prior to the loss. City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195-96 (1995). The district court's award satisfies this standard, and any interest awarded on funds the Commission received from the DOT would be a windfall and punitive, not compensatory.

## III. Conclusion

The government asks us to amend the judgment if we affirm the district court's findings to reflect the amount it, through the DOT, has already provided to the Commission to repair its bridge. At the end of the day, and after the affirmance of the district court's finding that the Corps was 100% liable for the damage to the bridge, this request essentially boils down to a dispute between two Departments of the Article II Executive Branch over which Department's funds will be used to compensate the State of Arkansas. We are of the view that it is no business of the Third Branch, the Article III Judiciary, to referee that fight. Our responsibility in this case was to determine if the United States of America was the entity responsible for the damage to the State's bridge. Having done so, we see our work completed. For the above stated reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.